D. Angus Lee, OSB No. 213139
ANGUS LEE LAW FIRM, PLLC
9105 NE Highway 99, Suite 200
Vancouver, WA 98665-8974
(360) 635-6464
angus@angusleelaw.com

Endel Kolde
(pro hac vice)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Suite 801
Washington, D.C. 20036
(202) 301-1664
dkolde@ifs.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| BRUCE GILLEY,<br><br>    *Plaintiff*,<br><br>v.<br><br>TOVA STABIN, in her individual capacity; and the COMMUNICATION MANAGER of the University of Oregon's Division of Equity and Inclusion, in his or her official capacity,<br><br>    *Defendants*. | Case No. 3:22-cv-01181-HZ<br><br>PLAINTIFF'S POST-HEARING MEMORANDUM |

Gilley should prevail on the cross-motions for the following reasons:

1. *UO does not have a social media policy*

Guidelines are not policy. During arguments at the hearing, Defense counsel repeatedly invoked UO's alleged "policy" against viewpoint discrimination as a basis to deny Gilley relief and moot the case. But UO has already admitted that its guidelines do not rise to the level of university policy.

PLNTF'S POST-HEARING MEMO. - 1

This matters because policies involve greater levels of approval and are harder to change later. UO's VP for Communications, Richie Hunter, admitted during her Rule 30(b)(6) deposition that UO's social media guidelines are *not* official UO policy. ECF No. 42-13 at 106:12-18 (Q:…Whatever those processes are that require formal approval of policies, the social media guidelines have not gone through them because they're just guidelines. A. Correct."), 107:3-13 ("…it evolves, and especially in a situation related to social media which is ever changing"). Her testimony is corroborated by UO's own public representations on what constitutes a policy. ECF No. 42-6 at 2 ("What is a University 'policy'… Excluded from this definition are things such as…operating guidelines, internal procedures…"). While an official policy does not enjoy the same level of deference as legislation,[1] it would at least establish some level of "rights, requirements or responsibilities" (ECF No. 42-6 at 2).

Calling UO's ever-evolving guidelines a "policy" is an attempt to bolster their significance. UO has not cited any cases holding that informal, changing guidelines can *ever* moot a free-speech claim. Thus, UO has an incentive to mislabel the guidelines.

The guidelines' malleability is also demonstrated by UO quietly moving to drop the "ban" language from its guidelines will this litigation was ongoing. *Compare* ECF No. 24-1 at 2 *with* ECF No. 39-1 at 9. The timing of this change makes it suspect, much like the University of Michigan's litigation-influenced policy change in *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769 (6th Cir. 2019) (claims not

---

[1] *McCormack v. Herzog,* 788 F.3d 1017, 1025 (9th Cir. 2015) (While a statutory change is usually enough to render a case moot, an executive action not governed by any clear or codified procedures cannot moot a claim).

PLNTF'S POST-HEARING MEMO. - 2

mooted). The permanent ban language is inconvenient for UO because it partly justifies Gilley's decision to self-censor, in order to avoid a permanent ban.[2] If UO can so easily drop language that proves inconvenient during litigation, then it can easily add back a similar guideline after this case concludes.

2. *UO bears the burden of proving mootness*

In addition to inaccurately calling UO's guidelines a "policy," defense counsel also argued that *Rosebrock v. Mathis,* 745 F.3d 963 (9th Cir. 2014) stands for the proposition that Gilley bears the burden of disproving mootness.

*Rosebrock* says the exact opposite: "We presume a government entity is acting in good faith when it changes its policy*, but when the Government asserts mootness* based on such a change *it still must bear the heavy burden* of showing that the challenged conduct cannot reasonable be expected to start up again." *Rosebrock,* 745 F.3d at 971 (cleaned up; emphasis added); *see also, e.g., Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (government must show its change in behavior is permanent and entrenched). Here UO doesn't even have a policy to change or re-affirm, because there is no university policy on social-media blocking.

Especially in the realm of social media, where blocking decisions can be reversed and re-imposed with the flip of a virtual switch, the Ninth Circuit and other courts have already recognized that First Amendment claims cannot be mooted by unblocking the plaintiff or closing the forum. *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1168 (9th Cir. 2022) (finding claims not moot where officials could re-open

---

[2] While UO has dropped the ban language from its most recent internal guidelines, the ban language is still extant in the public-facing version on its website, first posted after this lawsuit was filed. ECF No. 24-1 at 2 ("you have the right to ban…the user"); UO, *Social Media Guidelines,* https://communications.uoregon.edu/social-media-guidelines (last visited Dec. 19, 2022) (same); ECF No. 42-13 at 170:14-19 (blocking criteria were not on public-facing website before lawsuit). This contradiction between UO's internal and external guidelines only muddies the waters further.

PLNTF'S POST-HEARING MEMO. - 3

interactive features of social media forum); *Davison v. Randall*, 912 F.3d 666, 675-76 (4th Cir. 2019) (claim allowed to proceed were post was deleted and plaintiff blocked for 12 hours); *Blackwell v. City of Inkster,* No. 2:21-CV-10628-TGB-EAS, 2022 U.S. Dist. LEXIS 61206, at *11 (E.D. Mich. Mar. 31, 2022) (social-media blocking case proceeded to merits were plaintiff had been unblocked and protective stipulation was already in place); *Garnier v. O'Connor-Ratcliff*, 513 F. Supp. 3d 1229, 1245 (S.D. Cal. 2021) (finding standing for injunctive and declaratory relief in face of unblocking because could be blocked again). The common thread in these cases is that the government had not proven it wouldn't resume its illegal behavior later. "[I]t is not absolutely clear that Zane could not block Kimberly Garnier again." *Id.* Thus, it is not Gilley's burden to prove UO will block him again.

Common sense supports this analysis, because otherwise state actors would be incentivized to block critics, dare them to sue, and then quickly unblock them and claim mootness. This cycle could go on indefinitely and would insulate government censors from having their activities reviewed by federal courts.

   3. *The interactive portions of @UOEquity are presumptively a designated public forum*

Where the government has made an interactive social-media forum available for use by the public and has no policy or practice of screening that content, it has created a designated public forum. *Garnier,* 41 F.4th at 1179 (citing *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001)). Moreover, it is not enough that government officials occasionally delete or hide comments; they must have a consistent practice of doing so, along with clear and definite access rules. *Id.; see also Hopper v. City of Pasco,* 241 F.3d 1067, 1076 (9th Cir. 2001) ("A policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced

PLNTF'S POST-HEARING MEMO. - 4

or if exceptions are haphazardly permitted"); *compare Seattle Mideast Awareness Campaign v. King County,* 781 F.3d 489, 497-98 (9th Cir. 2015) (county's transit advertising program consistently applied detailed screening criteria before ads were displayed, making it a limited public forum).

Although defense counsel has attempted to convert, through argumentation alone, UO's iterative and evolving guidelines into fixed policy, the evidence shows that UO has not done the work that is needed to create a limited public forum. Setting aside that UO first told Gilley that it had no written blocking criteria, Tova Stabin said that Twitter was the social media she paid "least attention to," that she had only ever blocked three people, and "barely know how to do it." ECF No. 42-4. This does not describe a rigorous content-screening program.

Similarly, Leslie Larson, UO's Director of Content Strategy, declared that @UOEquity had only ever blocked three users and that some other critical replies had not been blocked. ECF No. 46 at 2 (¶¶ 5-7). Some of the examples she appended as non-blocked comments appear to be both critical of UO and at least as "off-topic" as UO claims Gilley was. *See* ECF No. 46-1. Notably, a user going by the handle @StewbieDoobyDo replied to the same Racism Interrupter tweet with clown-face emojis and, a few days later, virtually the same "all men are created equal" comment that Gilley had posted, *but* without getting blocked. *Id.* at 42. This illustrates that UO is inconsistent in applying its guidelines.

Similar evidence caused the U.S. District Court for the Western District of Washington to hold last year that that a city had created a designated public forum in the interactive portions of its official Facebook page. *Kimsey v. City of Sammamish*, 574 F. Supp. 3d 911, 919-920 (W.D. Wash. 2021) (relying on *Seattle Mideast Awareness Campaign,* 781 F.3d at 496):

> First, by allowing comments on its Facebook posts and City Council meetings without any prior approval, the City made this forum wide open to the public and imposes no requirements to obtain prior approval before making comments. The comment section is akin to a traditional public forum where access is "unfettered" and "indiscriminate." And while there are rules for comments after they have been made, they do not constrain the public's initial access. This fact is important because prior approval weighs in favor of a limited forum—a fact absent here. Second, Plaintiffs have demonstrated that the City does not always apply its "off topic" rule consistently.

*Kimsey* 574 F. Supp. 3d at 920 (cleaned up).

Like the City of Sammamish, UO does not screen content before posting, and it apparently rarely screens content after posting. While UO seeks to take credit for rarely blocking posters, in so doing, it has also proven that the interactive portions of @UOEquity are a designated public forum, not a limited public forum.[3]

    4.  *UO's content-based guidelines are presumptively unconstitutional*

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert,* 576 U.S. 155, 163, (2015)*; see also Berger v. City of Seattle,* 569 F.3d 1029, 1051-52 (9th Cir. 2009) (same); *Kimsey,* 574 F. Supp. 3d at 921. UO's social media guidelines are obviously content based because they require a UO official to examine the content of a reply or re-tweet to determine whether the user should be censored. *Reed,* 576 U.S. at 164; *Berger,* 569 F.3d at 1051.

Applying strict scrutiny in *Kimsey,* the district court held that the city's interest in avoiding the dilution of the government's message did not serve as a compelling

---

[3] If UO wishes to claim the benefits of a limited public forum, then it must prove that its access rules are "clear and unambiguous." *Garnier,* 41 F.4th at 1178. That is all-but impossible in a forum where some allegedly "off-topic" posters are excluded, while others are not. The same is true for comments that are "offensive" or "inappropriate," because such access rules are too subjective.

government interest. 574 F.3d at 921. That same reasoning should apply here. Avoiding dilution of @UOEquity's Racism Interrupter message does not provide a compelling basis for censoring speech, including off-topic speech.

Even if that matter was debatable, it is UO's burden to justify its guidelines, not Gilley's burden to show that they are unconstitutional. *Id.* Once a plaintiff has shown a colorable free-speech claim, it is the government's burden to justify its speech restrictions. *Masonry Bldg. Owners of Or. v. Wheeler*, 394 F. Supp. 3d 1279, 1294 (D. Or. 2019); *Woodstock v. City of Portland*, No. 3:20-cv-1035-SI, 2020 U.S. Dist. LEXIS 116612, at *10 (D. Or. July 2, 2020).

UO has not met its burden here. Even if one accepts as true Tova Stabin's vague statements about the risks of off-topic comments, they are insufficient to conjure up a compelling government interest. At the hearing, defendants made virtually no effort to show that their guidelines satisfy strict scrutiny, a tacit admission that they cannot do so. And one that "alone justifies finding a strong likelihood that [Plaintiff] will succeed on the merits of [his] First Amendment claim." *Kimsey,* 547 F. Supp. 3d at 921.

5.  *UO's guidelines codify viewpoint discrimination*

UO's guidelines enshrine viewpoint discrimination because they allow blocking or banning of users whom the communication manager deems, subjectively, to have posted content that is offensive, racist, hateful, or otherwise inappropriate. *See, e.g., Am. Freedom Def. Initiative v. King County,* 904 F.3d 1126, 1132 (9th Cir. 2018); ECF No. 32 at 24-27 (collecting cases on offensive viewpoints). That UO has maintained its right to enforce its guidelines, even in the face of litigation, is telling of UO's future intent.

Defense counsel's repeated arguments that the UO's guidelines "prohibit" viewpoint discrimination are insufficient to meet its burden to justify them. At best,

PLNTF'S POST-HEARING MEMO. - 7

the guidelines suggest that users should not be blocked based on some viewpoints, so long as they aren't offensive, inappropriate, racist, hateful, or other unacceptable viewpoints. *See* ECF No. 24-1 at 2. Those viewpoints are off-limits. The guidelines are thus contradictory and patently insufficient to meet UO's burden. Guidelines that ban only some viewpoints are still viewpoint discriminatory. It is not legal for UO to engage in just a little bit of viewpoint discrimination.

UO's guidelines also invite viewpoint discrimination because they use vague and subjective terminology that lacks detailed implementation guidance. *See e.g., Minn. Voters All. v. Mansky,* 138 S. Ct. 1876, 1891 (2018) (striking down restriction on "political" t-shirts; officials' "discretion must be guided by objective, workable standards"); *Cal. Teachers Ass'n v. Bd. of Educ.*, 271 F.3d 1141, 1150-51 (9th Cir. 2001) (vague statutes "impermissibly delegate basic policy matters to lower level officials for resolution on an ad hoc and subjective basis…"); *Marshall v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021) ("In parsing out these subjective terms, the School Board has presented no examples of guidance or other interpretive tools to assist in properly applying Policies 903 and 922 to public comments"). For example, whether a comment qualifies as "racist" or "offensive" is often not obvious, and a university communication manager heavily steeped in anti-racism ideology or "psychological safety" theories is likely to have a much broader definition of what is racist or offensive than either the average American or Oregonian.

Defendants' claims that Tova Stabin blocked Bruce Gilley for being off-topic are also not credible. First, his comment about equality is self-evidently relevant to the topic of racism. Second, Stabin's internal emails show that she was offended by his comment, and perhaps even disliked him personally. Her emails did not indicate that she was confused; rather she characterized his comment as "obnoxious" and accused him of "talking something about the oppression of white men[.]" ECF Nos.

PLNTF'S POST-HEARING MEMO. - 8

42-4; 51. She also claimed he was "there to just trip you up and make trouble," indicating that she viewed him as a problem. ECF No. 51. The most reasonable explanation (as evidenced by the email she wrote 13 days after blocking Gilley) is that Stabin interpreted Gilley's comment about equality as complaining about the oppression of white men, which offended her, so she blocked him.

During Stabin's testimony, she offered no good explanation for why she described his comment that way, called him "obnoxious," or referred to him as "Bruce." Moreover, she had no good explanation for why she blocked the other two users who had expressed conservative, DEI-critical opinions on Twitter. *See* ECF No. 5-13. She wasn't even willing to admit that their posts were critical of the Division or DEI. *Id.* Ms. Stabin's memory is selective, self-serving, and contradicts the emails she wrote at the time.

Stabin also admitted that she had looked at Gilley's Twitter feed. Consistent with this, defense counsel's cross-examination of Gilley about unrelated statements made in other fora was an attempt to label Gilley as holding "offensive" neo-colonialist views, unworthy of protection.

Moreover, neither Stabin, nor Kelly Pembleton (the Division's Chief of Staff and Asst. VP of Equity and Inclusion) made *any* effort to unblock Gilley after he made a public records request about blocked users and blocking criteria, a few weeks after the blocking. *See* ECF No. at 5-11. Most reasonable officials would interpret such a request as a sign that the requester thought there was a problem. On this evidence, it is more than probable to infer that Stabin thought her blocking was justified because Gilley and his views were offensive; as did the Division's Chief of Staff.

It is also telling that UO has not acknowledged Stabin's macro-aggression, but has instead doubled down on her "off-topic" story and defended UO's existing guidelines; even suggesting that enjoining the guidelines would interfere with UO's

PLNTF'S POST-HEARING MEMO. - 9

"internal affairs." UO apparently wants to keep open the option to censor some views and won't admit that it did so before.

This cuts heavily against mootness. *See, e.g., Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 719 (2007) (no mootness where Seattle continued to vigorously defend the constitutionality of its race-based program); *Speech First, Inc.,* 939 F.3d at 770 (no mootness where university continued to defend speech burdens); *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161-62 (3d Cir. 2019) (declaratory relief claim not moot where government continued to defend its prior rule).

The first step toward solving a problem is admitting that there is a problem. UO has not done that here. There are numerous possible solutions for providing lasting protection for Gilley's (and others') rights to criticize UO on its social media, but such solutions should be negotiated with a preliminary injunction in place.

At a minimum, UO should be preliminarily enjoined from:

- Viewpoint discriminatory blocking on @UOEquity, including DEI critics;
- Enforcing viewpoint-based guidelines against offensive, inappropriate, hateful, or racist speech, or threatening ideas;
- Selectively enforcing any guidelines against disfavored speakers or views;
- Relying on subjective blocking criteria without detailed written guidance; and
- Enforcing any content-based restrictions, including the off-topic rule, in the absence of a rigorous monitoring program, adequate training, and a defined appeals process.

## CONCLUSION

This Court should grant Bruce Gilley's motion for a preliminary injunction and deny UO's motion to dismiss.

PLNTF'S POST-HEARING MEMO. - 10

| Respectfully submitted, | Dated: December 20, 2022 |
|---|---|
| *s/Endel Kolde* | *s/D. Angus Lee* |
| Endel Kolde | D. Angus Lee |
| (pro hac vice) | OSB No. 213139 |
| INSTITUTE FOR FREE SPEECH | ANGUS LEE LAW FIRM, PLLC |
| 1150 Connecticut Ave., NW | 9105 NE Highway 99 |
| Suite 801 | Suite 200 |
| Washington, D.C.  20036 | Vancouver, WA 98665-8974 |
| (202) 301-1664 | (360) 635-6464 |
| dkolde@ifs.org | angus@anguslelaw.com |

*Attorneys for Bruce Gilley*