IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRUCE GILLEY, an individual,                    No 3:22-cv-01181-HZ

                Plaintiff,                    OPINION & ORDER

    v.

TOVA STABIN, in her individual
capacity; and the COMMUNICATION
MANAGER of the Division of Equity
and Inclusion at the University of Oregon,
in his or her official capacity,

                Defendants.


Endel Kolde
Institute for Free Speech
1150 Connecticut Ave NW Ste 801
Washington, DC 20036

D. Angus Lee
Angus Lee Law Firm PLLC
9105 NE Hwy 99 Ste 200
Vancouver, WA 98665

      Attorneys for Plaintiff

Stephen F. English
Misha Isaak
Jeremy A. Carp
Perkins Coie, LLP
1120 NW Couch St, 10th Floor
Portland, OR 97209

     Attorneys for Defendants

HERNÁNDEZ, District Judge:

     Plaintiff Bruce Gilley moves for a preliminary injunction enjoining the Division of

Equity and Inclusion at the University of Oregon from blocking him from interacting with the

@UOEquity account on Twitter. Plaintiff further challenges the constitutionality of the

University's social media guidelines. Plaintiff also seeks declaratory relief and nominal damages.

Defendants move to dismiss on mootness grounds. Oral argument was held on December 16,

2022. For the following reasons, the Court denies both motions.

## BACKGROUND

     This case arises out of a brief Twitter encounter involving employees at two universities

in Oregon. Defendant tova stabin[1] was previously the Communication Manager for the Division

of Equity and Inclusion ("the Division") at the University of Oregon. Am. Compl. ¶ 21, Ex. 2,

ECF 29. The Division is administered by the Office of the Vice President for Equity and

Inclusion ("VPEI") at the University of Oregon. *Id.* ¶ 20. Defendant stabin reported to the

Communications Department. Carp Decl. Ex. 2, Stabin Dep. 81:16-82:5, ECF 48.

     On or about June 14, 2022, Defendant stabin, in her capacity as Communication

Manager, posted a "racism interruptor" to the Division's Twitter page, @UOEquity. Am. Compl.

---

[1] Defendant stabin's filings state that she spells her name with all lowercase letters.

¶ 48. The Tweet read "You can interrupt racism," and the prompt read, "It sounded like you just said_____. Is that really what you meant?" *Id.* ¶ 49.

Plaintiff Bruce Gilley, a professor at Portland State University, responded to the Tweet the same day it was posted with the entry "all men are created equal." *Id.* ¶¶ 52, 59. Plaintiff is critical of diversity, equity, and inclusion ("DEI") principles, and intended his tweet to promote a colorblindness viewpoint. *Id.* ¶¶ 55, 59. Plaintiff tagged @uoregon and @UOEquity in his re-tweet. *Id.* ¶¶ 60-61. Also on June 14, 2022, Defendant stabin blocked Plaintiff from the @UOEquity account. *Id.* ¶¶ 62-63. Once he was blocked, Plaintiff could no longer view, reply to, or retweet any of @UOEquity's posts. *Id.* ¶ 64.

Plaintiff later filed a public records request with the University of Oregon to inquire about the policy VPEI uses to block Twitter users. *Id.* ¶ 68; Widdop Decl. ¶ 3, Ex. 1, ECF 25. The University initially responded that there was no written policy and that "the staff member that administers the VPEI Twitter account and social media has the autonomy to manage the accounts and uses professional judgment when deciding to block users." Am. Compl. ¶ 68; Widdop Decl. ¶ 4, Ex. 2. Plaintiff also asked whether other Twitter users had been blocked from @UOEquity, and the University responded that two other users were blocked. Am. Compl. ¶ 69; Gilley Decl. ¶ 61, Ex. L, ECF 5. Plaintiff asserts that "[b]oth of the other users have expressed politically conservative viewpoints, including criticizing posts of the @UOEquity account." Am. Compl. ¶ 70.

On June 27, 2022, Defendant stabin responded to an email from University of Oregon employee Kelly Pembleton, who was helping respond to Plaintiff's public records request. Defendant stabin sent the following in response to Pembleton's request for a list of the users she had blocked on @UOEquity:

> Doesn't take real long. I've only ever blocked three people. Here is the list. I'm
> assuming the issue is this guy Bruce Gilley. He was not just being obnoxious, but
> bringing obnoxious people to the site some. We don't have much following and it's
> the social I pay least attention to. Here's a screenshot of everyone I've ever blocked.
> I hardly do it (and barely know how to).

 Kolde Second Supp. Decl. Ex. 4, ECF 42. Minutes later, Defendant stabin sent another

email to Pembleton about the records request. The email reads, in pertinent part:

> Oh, I see. It is Bruce who brought it. Not surprising. He was commenting on one
> of the "interrupt racism" posts, as I recall talking something about the oppression
> of white men, if I recall. Really, they are just there to trip you up and make trouble.
> Ugh. I'm around at home for a quick zoom about it.

Supp. to Kolde Second Supp. Decl., ECF 51.

On or about July 27, 2022, Defendant stabin retired from the University of Oregon.

Widdop Decl. ¶ 5, Ex. 4 at 3.[2] Defendant stabin testified that while she reported to the

University's Communications Department, she understood that her successor would report to the

Division. As of the date of oral argument, no successor had been hired.

On August 11, 2022, Plaintiff sued Defendant stabin for violating his First Amendment

rights in blocking him on @UOEquity. Compl., ECF 1. The University's Office of General

Counsel learned of the lawsuit the following day. Park. Decl. ¶ 3, ECF 19. Also on August 12,

2022, the Division unblocked Plaintiff's Twitter account from @UOEquity. Id. ¶ 4. On August

16, 2022, Kevin Reed, the University's general counsel, sent a letter to Plaintiff's counsel, Del

Kolde. Id. ¶ 5, Ex. 2. This letter read, in part:

> In any event, Prof. Gilley (@BruceDGilley) was unblocked from the Twitter
> account at issue (@UOEquity) last Friday, August 12, 2022, and the Division of
> Equity and Inclusion does not intend to block him or anyone else in the future based
> on their exercise of protected speech. My office has reinforced to our colleagues
> who control the University's multiple social media channels that, if they open such
> channels to comments, they may not block commentary on the basis of the

---

[2] Defendant stabin clarified at the hearing that her last day of work was July 27, but her last
official day at the University was August 12, 2022, as she used some vacation days.

viewpoints expressed. I have further confirmed that those social media channels controlled by UO's central communications unit have no blocked users.

Finally, enclosed with the hard copy of this letter to Mr. Lee is $20 to cover the nominal damages of $17.91 alleged in your complaint. Ordinarily the University would issue a check; however, we are enclosing cash to avoid the administrative hassle and delay of issuing a check. Accordingly, your lawsuit is now moot, as there is no longer any effective relief that the federal court can grant, and we ask that you voluntarily dismiss it.

*Id.* Plaintiff declined to dismiss the suit.

On September 2, 2022, the University amended its response to Plaintiff's original public records request, stating that the University did maintain social media guidelines that covered when individuals could be blocked on social media. Widdop Decl. ¶ 6, Ex. 4 at 1. The University provided Plaintiff a link to the guidelines, which are posted on the University's website. *Id.*; Am. Compl. ¶ 74. The guidelines provide that each unit should determine whether to have a social media presence. Larson Decl. I Ex. 1 at 1, ECF 24. A faculty or staff member from each unit with a social media presence is to be assigned to oversee the accounts. *Id.* The substantive guidelines read as follows:

When launching a social media account, be prepared` to monitor the comments that will get posted. As a public university that values freedom of speech and a robust exchange of ideas, you should err on the side of letting people have their say when commenting on our social media properties. When appropriate, engage with commenters and repliers, even if it's just to like or reply to their comments or to acknowledge their criticism. Don't delete comments or block users because they are critical or because you disagree with the sentiment or viewpoint. But you may remove comments, messages and other communications and restrict access to users who violate the following guidelines:

- Post violent, obscene, profane, hateful or racist comments or otherwise uses offensive or inappropriate language
- Threaten or defame
- Post comments that are out of context, off topic or not relevant to the topic at hand
- Disclose personally identifiable information, such as addresses or phone numbers
- Include copyrighted materials

- Fall under the category of spam
- Suggest or encourage illegal activity
- Solicit, advertise or endorse a third-party business or service
- Are multiple successive posts by a single user
- Are disruptively repetitive posts copied and pasted by multiple users

If a user engages in particularly egregious behavior, or continues to post comments in violation of our standards (i.e.: replies repeatedly with comments that are off topic and that don't contribute to meaningful dialogue), you have the the [sic] right to ban or hide the user.

*Id.* at 2.

Defendants later clarified that the preceding guidelines are a shorter, less frequently updated component of the University's internal guidelines. Larson Decl. II ¶¶ 5-7, ECF 39. The longer guidelines are an internal document not posted on the University's website. *Id.* ¶ 5, Ex. 1. This document covers a range of topics, including strategies for each social media platform and goals of engagement. *Id.* It includes a posting schedule with content areas and themes. *Id.* at 7. The document also contains the following language:

**ENGAGEMENT: MONITORING AND RESPONDING TO COMMENTS:**

When launching a social media account, be prepared` to monitor the comments that will get posted. As a public university that values freedom of speech and a robust exchange of ideas, you should err on the side of letting people have their say when commenting on our social media properties. When appropriate, engage with commenters and repliers, even if it's just to like or reply to their comments or to acknowledge their criticism. Don't delete comments or block users because they are critical or because you disagree with the sentiment or viewpoint. But you may remove comments, messages and other communications and restrict access to users who violate the following guidelines:

- Are violent, obscene, profane, hateful or racist or otherwise use offensive or inappropriate language
- Threaten or defame
- Are out of context, off topic or not relevant to the topic at hand
- Disclose personally identifiable information, such as addresses or phone numbers
- Include copyrighted materials
- Fall under the category of spam

- Suggest or encourage illegal activity
- Solicit, advertise or endorse a third-party business or service
- Are multiple successive posts by a single user
- Are repetitive posts copied and pasted by multiple users

On Facebook, Twitter and Instagram, we have the option of "hiding" spam, inappropriate or off-topic comments, which means it will only be seen by the person who wrote it and their friends.

*Id.* at 8-9.

In an email sent on May 16, 2022, Larson, the Director of Content Strategy in the Communications Department at the University, told other University employees: "We do occasionally ban users and delete/hide comments on social media. We have had to do this more and more on Instagram due to aggressive spamming and off topic posts." Larson Decl. II ¶¶ 2, 13-14, Ex. 3. Larson's email included the following language from the guidelines:

We don't delete comments because they are critical or because we disagree with the sentiment or viewpoint. But we reserve the right to remove comments, messages and other communications and restrict access to users who violate these guidelines:

- Include violent, obscene, profane, hateful or racist comments or otherwise uses offensive or inappropriate language
- Threaten or defame
- Are out of context, off topic or not relevant to the topic at hand
- Disclose personally identifiable information, such as addresses or phone numbers
- Include copyrighted materials
- Fall under the category of spam
- Suggest or encourage illegal activity
- Solicit, advertise or endorse a third-party business or service
- Are multiple successive posts by a single user
- Are disruptively repetitive posts copied and pasted by multiple users

*Id.* Ex. 3 at 1. The email was sent in response to an inquiry from Julianne Davis, a communications and marketing specialist at the University. *Id.* at 2-3. Davis described an individual who opposed a program at the University and frequently commented on the

University's social media posts to express her opposition. *Id.* Davis asked whether the University had a policy on blocking or banning individuals on social media. *Id.* at 3.

On August 16, 2022, Larson sent an email with the subject line "UO Communications social media policy on blocking users" to several University staff members. Larson Decl. III ¶ 10, Ex. 4, ECF 46. The email began: "I am sharing these guidelines to reaffirm our long-standing policy related to blocking users on social media. Please unblock any users you have blocked immediately unless you can make a compelling case that they have violated the guidelines set forth below." *Id.* It then excerpted the social media guidelines on blocking or banning users and provided a hyperlink to them. *Id.*

Plaintiff expresses concern that the University's social media guidelines will be used to block or ban him again. Am. Compl. ¶ 80. He testified at the hearing that he is self-censoring in the form of avoiding engagement with @UOEquity and other University Twitter accounts to avoid being blocked again or being permanently banned.

Plaintiff initially sought a temporary restraining order, which the Court denied for failure to give notice or explain why notice should not be required. Order, ECF 7. Defendants appeared and moved to dismiss for lack of subject matter jurisdiction on mootness grounds. Def. Mot. to Dismiss, ECF 23; Def. Mot. to Dismiss First Am. Compl., ECF 35. Oral argument on Plaintiff's motion for a preliminary injunction and Defendants' motion to dismiss was held on December 16, 2022. The Court now resolves both motions.

//

//

//

**DISCUSSION**

I.      **Motion to Dismiss for Mootness**

Plaintiff's Amended Complaint names two defendants: tova stabin, who is sued in her individual capacity; and the still-unknown Communication Manager of the University's Division of Equity and Inclusion, who is sued in his or her official capacity. As Defendant stabin has retired from the University, the Court analyzes prospective relief with respect to Defendant Communication Manager only. The Court analyzes monetary relief with respect to Defendant stabin. For the reasons that follow, the Court concludes that this matter is not moot.

A.      Standards

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1) addresses the court's subject matter jurisdiction. The party asserting jurisdiction bears the burden of proving that the court has subject matter jurisdiction over his or her claims. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A motion to dismiss on mootness grounds is properly raised under Rule 12(b)(1) because mootness pertains to a federal court's subject matter jurisdiction under Article III. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

A Rule 12(b)(1) motion may attack the substance of the complaint's jurisdictional allegations even though the allegations are formally sufficient. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979-80 (9th Cir. 2007) (court treats motion attacking substance of complaint's jurisdictional allegations as a Rule 12(b)(1) motion); *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) ("[U]nlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency[.]") (internal quotation omitted). Additionally, the court may consider evidence outside the pleadings to resolve factual disputes. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *see also*

*Dreier*, 106 F.3d at 847 (a challenge to the court's subject matter jurisdiction under Rule 12(b)(1) may rely on affidavits or any other evidence properly before the court).

Under Article III of the Constitution, federal courts only have jurisdiction over "cases" and "controversies." U.S. Const. art. III, § 2. The Supreme Court has interpreted this to require "that an actual controversy … be extant at all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016), *as revised* (Feb. 9, 2016) (internal quotations omitted). "[A] suit becomes moot, 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." 577 U.S. at 160-61 (internal quotations omitted). A case is only moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* at 161 (internal quotations omitted).

A federal court cannot issue a declaratory judgment if a claim has become moot. *See United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 89 (1947); *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1514 (9th Cir. 1994) (overruled on other grounds). A request for declaratory relief becomes moot when the facts alleged fail to "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment." *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) (emphasis omitted); *see also Jones Intercable of San Diego v. City of Chula Vista*, 80 F.3d 320, 328 (9th Cir. 1996) (cable provider's claim for declaratory relief moot where it no longer could or wanted to operate cable system); *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 815 (9th Cir.

1995) (community's claim for declaration that it owned rights to the sea floor moot where sale of lease rights to sea floor was cancelled with no immediate prospect of another sale); *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1195 (9th Cir. 2000) (claim for declaration that law school's affirmative action policy was unlawful moot after passage of statute prohibiting affirmative action).

"A request for injunctive relief remains live only so long as there is some present harm left to enjoin." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017) (internal quotations omitted). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* (internal quotations omitted). "Thus, a claim for injunctive relief becomes moot once subsequent events have made clear the conduct alleged as the basis for the requested relief could not reasonably be expected to recur." *Id.* (internal quotations omitted).

"[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case unless it can be said with assurance that there is no reasonable expectation … that the alleged violation will recur and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1037 (9th Cir. 2018) (internal quotations omitted).

"A party asserting mootness has the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again. *Id.* (cleaned up) (internal quotations omitted). Where, as here, that party is the government, the court presumes that it is

acting in good faith, "though the government must still demonstrate that the change in its

behavior is entrenched or permanent." *Id.* (internal quotations omitted).[3]

Where the voluntary cessation is not reflected in a change in statute, ordinance, or

regulation, the Ninth Circuit has stated that the following factors indicate that mootness is more

likely:

> (1) the policy change is evidenced by language that is broad in scope and
> unequivocal in tone; (2) the policy change fully addresses all of the objectionable
> measures that [the Government] officials took against the plaintiffs in th[e] case;
> (3) th[e] case [in question] was the catalyst for the agency's adoption of the new
> policy; (4) the policy has been in place for a long time when we consider
> mootness; and (5) since [the policy's] implementation the agency's officials have
> not engaged in conduct similar to that challenged by the plaintiff[ ].

*Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014) (internal citations and quotations

omitted).

In *Rosebrock*, a veteran hung an American flag outside the lawn of the Department of

Veterans Affairs ("VA") Los Angeles campus in protest; the VA permitted him to do so when he

hung the flag right side up, but did not permit him to do so when he hung it upside down. *Id.* at

966. The VA relied on a 1973 regulation that prohibited the posting of materials on VA property.

*Id.* After Rosebrock sued for viewpoint discrimination, the associate director at the Los Angeles

VA sent an email to the campus police force directing officers to consistently enforce the no-

---

[3] Defendants argue that Plaintiff bears the burden to show the case is not moot. Def. Post-
Hearing Resp. 6, ECF 56. They overstate the effect of the presumption of good faith. Defendants
are entitled to a presumption that the actions they have taken were taken in good faith, but they
still must convince the Court that the actions themselves are by their nature sufficient to moot the
case under the circumstances. The cases on which Defendants rely are not to the contrary, as they
address the acts of legislative bodies. *Cocina Cultura LLC v. State*, No. 3:20-CV-01866-IM,
2021 WL 3836840, at *6 (D. Or. Aug. 27, 2021); *Rentberry, Inc. v. City of Seattle*, 814 F. App'x
309, 309 (9th Cir. 2020). The Ninth Circuit has held that the acts of legislative bodies in
repealing or amending challenged legislation or allowing it to expire should be presumed to be
sufficient to moot a pending challenge to that legislation. *Bd. of Trustees of Glazing Health &
Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019).

materials regulation. *Id.* at 969. The district court held that the email mooted Rosebrock's claim for injunctive relief. *Id.* at 970. Affirming, the Ninth Circuit characterized the email as a recommitment to an existing policy and found that the VA was acting in good faith. *Id.* at 972-73. The Ninth Circuit also pointed to broad language in the email and the fact that closing the forum for all speech meant that viewpoint discrimination could no longer occur, noted the references to flags in the email as evidence that Rosebrock's suit was the catalyst, and observed that the recommitment to the policy happened over three years ago and that there had not been similar conduct in that time. *Id.* at 973-74. Thus, the case was moot despite the lack of procedural safeguards preventing a change in course. *Id.* at 974.

In contrast, in *Fikre*, the Ninth Circuit found that the Government's voluntary cessation of the challenged conduct was not enough to moot the case. *Fikre* involved an American citizen who was placed on the no fly list after spending time in Sudan for business. *Id.* at 1035. Fikre tried to restore his ability to fly through a request to the Department of Homeland Security but was unsuccessful. *Id.* at 1036. He sued, alleging due process violations. *Id.* The FBI moved to dismiss, stating that it had removed Fikre from the no fly list. *Id.* The Ninth Circuit held that the case was not moot, noting that Fikre's removal from the list was individualized, discretionary, and not tied to any explanation or change in policy. *Id.* at 1039-40. Furthermore, the FBI had not assured Fikre that he would not be placed back on the list for reasons similar to those behind his initial placement. *Id.* at 1040. Finally, the Ninth Circuit stated that Fikre faced ongoing stigma as a suspected terrorist because the FBI had never said that Fikre should not have been placed on the list based on the evidence available to it when it placed him on the list. *Id.*

//

//

B.    Application

    i.    Injunctive Relief

Applying the *Rosebrock* factors, the Court concludes that Defendants fall short of establishing that Plaintiff's claim for injunctive relief is moot. After Plaintiff filed suit, the University reinforced its social media guidelines through an email from Lesli Larson sent August 16, 2022. Larson Decl. III ¶ 10, Ex. 4. The email shared the guidelines and stated, "I am sharing these guidelines to reaffirm our long-standing policy related to blocking users on social media. Please unblock any users you have blocked immediately unless you can make a compelling case that they have violated the guidelines set forth below." *Id.*

The University's general counsel, Kevin Reed, also wrote directly to Plaintiff's counsel. The letter reads, in part:

> In any event, Prof. Gilley (@BruceDGilley) was unblocked from the Twitter account at issue (@UOEquity) last Friday, August 12, 2022, and the Division of Equity and Inclusion does not intend to block him or anyone else in the future based on their exercise of protected speech. My office has reinforced to our colleagues who control the University's multiple social media channels that, if they open such channels to comments, they may not block commentary on the basis of the viewpoints expressed. I have further confirmed that those social media channels controlled by UO's central communications unit have no blocked users.

Park Decl. Ex. 2.

With respect to the first *Rosebrock* factor, the email from Larson uses unequivocal language by instructing recipients to "immediately" unblock any blocked users unless they could "make a compelling case" that the user had violated the guidelines. Larson Decl. III ¶ 10, Ex. 4. The letter from Reed is broad in scope and unequivocal in tone.

With respect to the second factor, the email from Larson addresses Plaintiff's concerns in part by reaffirming that viewpoint discrimination is unacceptable insofar as the guidelines instruct University staff not to block users because they disagree with the viewpoint of a post.

14 – OPINION & ORDER

However, the email ultimately reinforces the social media guidelines, which Plaintiff challenges as themselves unconstitutional. And while Reed's letter states that his office also instructed the managers of social media pages not to engage in viewpoint discrimination, the Court does not know what language was used.

Plaintiff also argues that the guidelines are not as formal as a policy and thus are easier to change. Pl. Resp. to Mot. to Dismiss 16, ECF 32; Pl. Supp. Br. 3, ECF 43; Pl. Post-Hearing Mem. 1-3, ECF 55. The evidence suggests that Plaintiff is correct. Carp Decl. Ex. 1, Hunter Dep. 106:12-18 (agreeing that the guidelines are not official policy); Larson Decl. II ¶ 7 (stating that the internal social media guidelines are updated more frequently than the shorter, public-facing guidelines). Defendant counters that the guidelines are binding on employees and that employees are subject to discipline if they do not follow the guidelines. Hunter Dep. 196:19-197:13, 198:6-16). The Court also notes that the different versions of the guidelines since 2019 use almost identical wording in listing the categories of posts that can be blocked or deleted. Larson Decl. II Ex. 1 at 8-9, Ex. 2 at 9-10; Larson Decl. III Ex. 2 at 8-9, Ex. 3 at 3-4. The Court concludes that reaffirming the social media guidelines has value, but not to the same degree as reinforcing a more rigorously codified policy.

With respect to the third factor, Plaintiff's lawsuit is the catalyst for Defendants' subsequent actions, as indicated by the letter from Reed to Plaintiff's counsel, sent only days after Plaintiff filed suit. The email from Larson was likewise sent only days after Plaintiff filed his complaint.

With respect to the fourth factor, it is unclear how long the social media guidelines have been in place, but they appear to be relatively new. The @UOEquity Twitter account has existed since 2013. Larson Decl. III ¶ 3. The guidelines have existed at least since 2019. *Id.* ¶ 9, Ex. 3.

Defendants suggest that the University followed some form of unwritten guidelines prior to 2019, Def. Post-Hearing Resp. 3, but the Court has insufficient evidence to conclude that such guidelines existed or were followed.

With respect to the fifth factor, the Court has no evidence that the University has unconstitutionally blocked any users on its Twitter accounts since it unblocked Plaintiff.

Ultimately, this case falls between *Fikre* and *Rosebrock*. The Court rejects Plaintiff's contention that the University's unblocking of his Twitter account is temporary or that the University is not acting in good faith. However, Defendants rely on their reaffirmation of the social media guidelines, which are themselves challenged, and which are not a formal policy. Defendants have not met their burden to show that Plaintiff's request for injunctive relief is moot.

ii.    Declaratory Relief

Plaintiff seeks "[a] declaration that Defendants' decision to block Bruce Gilley, apply subjective 'professional judgment,' or UO'a [sic] social media guidelines when making blocking decisions for @UOEquity constitutes a violation of the First Amendment." Am. Compl. 27. Defendants unblocked Plaintiff's Twitter account and stated that "the Division of Equity and Inclusion does not intend to block him or anyone else in the future based on their exercise of protected speech." Park Decl. ¶¶ 4-5, Ex. 2 at 1.

 "In a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Supreme Court has interpreted the "case of actual controversy" language to require

> that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admi[t] of

specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotations omitted). Where the plaintiff faces a threat of liability, they need not actually incur the liability before seeking a declaratory judgment. *Id.* at 137.

Plaintiff's request for declaratory relief has both backward-looking and forward-looking components. To the extent that Plaintiff seeks a declaration that Defendants' past blocking of Plaintiff constituted a violation of the First Amendment, such a declaration is entirely retrospective and not cognizable under 42 U.S.C. § 1983. *LaTulippe v. Harder*, 574 F. Supp. 3d 870, 884 (D. Or. 2021) (concluding that 42 U.S.C. § 1983 only provides for prospective declaratory relief). Plaintiff's request for forward-looking declaratory relief is cognizable. There is a case of actual controversy with respect to the constitutionality of the University's social media guidelines. Plaintiff's claim for prospective declaratory relief is closely entwined with his claim for injunctive relief and is not moot for similar reasons.

> iii. Nominal Damages

Plaintiff's complaint seeks nominal damages in the amount of $17.91. Am. Compl. 27. On or about August 16, 2022, Kevin Reed, the University's general counsel, mailed Plaintiff $20 in cash in care of his attorney to satisfy Plaintiff's request for damages. Park Decl. ¶ 5, Ex. 2 at 2; Pl. Resp. 2.

The Supreme Court recently concluded that a request for nominal damages can, on its own, be sufficient to confer Article III standing on a plaintiff. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02 (2021). Such a request can also save a case from mootness. *See id.* The Supreme Court has not yet decided whether a defendant can moot a claim for nominal damages by depositing the full amount the plaintiff requested. *Id.* at 808 (Roberts, C.J., dissenting). In his

dissent in *Uzuegbunam*, Chief Justice Roberts noted that prior cases suggest that this would be possible. *Id.* (citing *California v. San Pablo & Tulare R.R. Co.*, 149 U.S. 308 (1893)). *See also* Def. Reply 11 n.7, ECF 36 (citing *San Mateo County v. S. Pac. R.R. Co.*, 116 U.S. 138 (1885); *Little v. Bowers*, 134 U.S. 547 (1890); *California v. San Pablo & Tulare R.R. Co.*, 149 U.S. 308 (1893)). In *San Pablo & Tulare Railroad Co.*, a suit for unpaid taxes was mooted when the defendant railroad deposited the full amount owing in a bank account for the purpose of payment. 149 U.S. at 313-14. More recently, the Ninth Circuit held that a plaintiff union's claim for back dues was mooted when the defendant paid the dues under protest and did not seek a refund. *S. California Painters & Allied Trades, Dist. Council No. 36 v. Rodin & Co.*, 558 F.3d 1028, 1035-36 (9th Cir. 2009).

The Ninth Circuit has also emphasized the difference between nominal and compensatory damages. *Bayer*, 861 F.3d at 871. "Damages are commonly understood to compensate a party for loss or harm sustained." *Id.* (internal quotation omitted). Yet "nominal damages are divorced from any compensatory purpose." *Id.* at 872. They serve two purposes: (1) "to vindicate rights, the infringement of which has not caused actual, provable injury," and (2) "to clarify the identity of the prevailing party for the purposes of awarding attorney's fees and costs in appropriate cases." *Id.* (internal quotation omitted). Nominal damages may be legal or equitable. *Id.* at 873-74. In *Bayer*, the Ninth Circuit held that nominal damages could be awarded as equitable relief under an anti-retaliation provision of the Americans with Disabilities Act. *Id.* at 874.

The Court concludes that Plaintiff's claim for nominal damages is not moot unless Defendant accepts entry of judgment in Plaintiff's favor for the amount of $17.91. *See Uzuegbunam*, 141 S. Ct. at 808 (Roberts, C.J., dissenting) (endorsing this as a manner to moot a claim for nominal damages). Payment of the damages does not on its own serve the purposes of a

suit for nominal damages outlined in *Bayer*, and is insufficient to moot the case. The Court agrees with Chief Justice Roberts that if Defendant chooses to accept entry of judgment, it may so moot Plaintiff's claim for damages.

The Court recognizes the actions the University of Oregon has taken in the wake of this lawsuit to address the concerns Plaintiff raises in his complaint. However, the University has not met its burden to show that the case is moot. The Court therefore turns to Plaintiff's motion for a preliminary injunction.

## II.    Preliminary Injunction

The Court analyzes Plaintiff's motion for a preliminary injunction with respect to Defendant Communication Manager only, as Defendant stabin has retired from the University of Oregon. As explained below, Plaintiff has failed to establish that he merits injunctive relief.

### A.    Standards

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show (1) that he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts may apply an alternative "serious questions" test, which allows for a preliminary injunction where a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in the plaintiff's favor, assuming the other two elements of the *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). This formulation applies a sliding scale approach where a

stronger showing of one element may offset a weaker showing in another element. *Id.* at 1131. Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

"[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). The plaintiff must still establish the other three *Winter* factors. *Id.* at 582-83 ("We do not simply assume that these elements collapse into the merits of the First Amendment claim.") (internal quotations omitted).

### B.    Likelihood of Success on the Merits

The Court concludes that Plaintiff has not met the standard for a preliminary injunction because, although he raises serious questions on the merits of some of his claims, he cannot establish that he is likely to suffer irreparable harm if he is not granted preliminary relief.

Plaintiff brings four claims against Defendants, all under 42 U.S.C. § 1983: (1) an as-applied challenge to the blocking of Plaintiff on Twitter; (2) a facial challenge to Defendants' alleged custom, policy, and practice of blocking users from interacting with @UOEquity based on unfettered professional judgment; (3) a facial challenge to the University's social media guidelines; and (4) an as-applied challenge to the University's social media guidelines. Am. Compl. ¶¶ 82-118.

### i.    Legal Standard

To succeed on his claims, Plaintiff must show that Defendants (1) acted under color of state law and (2) violated his First Amendment rights. 42 U.S.C. § 1983. The Ninth Circuit

recently held that trustees of a public school board acted under color of state law in blocking users on their public Facebook page. *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1171-72 (9th Cir. 2022). Defendants do not dispute that Defendant stabin acted under color of state law. Managing the @UOEquity Twitter account was part of Defendant stabin's duties at the University, and her testimony establishes that she was performing her duties when she blocked Plaintiff. The Court concludes that the state action requirement is met.

The government's authority to restrict speech depends on the type of forum in which the speech occurs. There are three categories of forum. *Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008). First, traditional public fora "are places such as streets and parks that traditionally have been devoted to expressive activity." *Id.* Restrictions in a traditional public forum must be narrowly tailored to serve a compelling state interest. *Id.* Second, "[d]esignated public fora are areas that the government affirmatively has opened to expressive activity"; restrictions in such fora must meet the same standard as in a traditional public forum. *Id.* Third, "[n]onpublic fora are areas that do not, by tradition or designation, serve as a forum for public communication." *Id.* In a nonpublic forum, restrictions on speech must be reasonable and viewpoint-neutral. *Id.* The relevant nuance here is that a limited public forum is created when the government intentionally opens a nonpublic forum to certain groups or topics. *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001). As in a nonpublic forum, restrictions in a limited public forum must be reasonable and viewpoint-neutral. *Id.* at 1075.

The parties disagree on whether the @UOEquity Twitter account is a designated public forum or a limited public forum. To resolve this issue, the Court must determine the extent to which the University has opened @UOEquity to speech. The government must affirmatively create a designated public forum; "it does not create a designated public forum through inaction

or by permitting only limited discourse." *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 497 (9th Cir. 2015). To determine whether the government has created a designated public forum or a limited public forum, courts consider three factors: (1) "the terms of any policy the government has adopted to govern access to the forum"; (2) "how that policy has been implemented in practice"; and (3) "the nature of the government property at issue," i.e., whether it is designed or intended for expressive activities. *Id.*

In *Seattle Mideast Awareness*, the Ninth Circuit held that a county program for advertisements on public buses created a limited public forum because the county adopted and consistently implemented a policy with a pre-screening process and fixed subject matter limitations on ads, and the primary purpose of the ads was to generate revenue, not create discourse. *Id.* at 497-98. In contrast, in *Garnier*, the Ninth Circuit held that trustees of a school board had created a designated public forum on their public Facebook page during the relevant period because the page was open to public comment and they had adopted no rules governing comments and reactions on the page. 41 F.4th at 1179.

Reviewing the three factors, the Court concludes that @UOEquity is a limited public forum. First, the University did adopt guidelines governing posting on social media. The pertinent part of the guidelines was posted online for anyone to view, and was also part of a larger internal document. Larson Decl. I ¶¶ 3-5, Ex. 1 at 2; Larson Decl. II ¶¶ 5-7, Ex. 1 at 8-9. The guidelines provide that comments within certain categories, including off-topic posts, can be deleted, and that users who violate the guidelines can be blocked. *Id.* Plaintiff points out that these guidelines appear more easily changed than a formal policy and that they have in fact been changed since he filed suit. Pl. Supp. Br. 3, ECF 43. Plaintiff is correct that the guidelines have been regularly altered; Defendants have acknowledged as much. Larson Decl. III ¶¶ 8-9, Exs. 2-

3 (versions of internal guidelines from 2019 and February 2021); Larson Decl. II ¶¶ 8-12, Exs. 1-2 (versions of internal guidelines from October 2021 and October 2022). However, all of these versions of the guidelines use almost identical wording in listing the categories of posts that can be blocked or deleted. Larson Decl. II Ex. 1 at 8-9, Ex. 2 at 9-10; Larson Decl. III Ex. 2 at 8-9, Ex. 3 at 3-4.

Plaintiff points to *Kimsey v. City of Sammamish*, 574 F. Supp. 3d 911, 919-920 (W.D. Wash. 2021). Pl. Post-Hearing Mem. 5. In *Kimsey*, the district court held that a city's Facebook page was a designated public forum, in part because the city did not require prior approval before allowing comments on the page. 574 F. Supp. 3d at 918, 920. The Court respectfully disagrees with this analysis. In *Garnier*, the Ninth Circuit focused on whether the government defendants had "established any rules of etiquette or decorum regulating how the public was to interact with their social media account." 41 F.4th at 1165. *Garnier* did not suggest that requiring prior approval for comments was necessary to create a limited public forum. It also recognized that "analogies between physical public fora and the virtual public fora of the present are sometimes imperfect, and courts applying First Amendment protections to virtual spaces must be mindful of the nuances of how those online fora function in practice." *Id.* at 1185. This is one such nuance. The Court doubts that requiring prior approval for every post on @UOEquity is a feasible method of content restriction, and Plaintiff points to no evidence suggesting that it is.

Second, the Court has limited information on the extent to which the guidelines are generally enforced. At the hearing, Plaintiff argued that @UOEquity is a designated public forum because the University has failed to consistently enforce the social media guidelines. There is some evidence to support this contention. For instance, while Plaintiff was blocked for posting "all men are created equal" in response to the Racism Interruptor prompt, another

Twitter user was not blocked for posting "all men are created equal" in response to the same prompt several days later. Larson Decl. III ¶¶ 6-7, Ex. 1 at 4. Only three users have been blocked since 2017. *Id.* ¶ 5. This could point to limited enforcement or to a paucity of posts that violate the guidelines. Defendant stabin testified at the hearing that @UOEquity was a relatively low-traffic account. This is supported by the data: since 2017, there have been a combined 2,558 replies and retweets on the account by other users. Larson Decl. III ¶ 4. In an email, Defendant stated that she rarely blocked people and barely knew how. Kolde Second Supp. Decl. Ex. 4. However, Plaintiff has not provided enough evidence of users who arguably should have been blocked under the guidelines. The Court does not know why the other two blocked users were blocked. The Court does not have enough evidence to conclude that the University is not consistently following the guidelines in managing the @UOEquity account. Mindful that the Supreme Court has required an affirmative act to create a designated public forum, the Court declines to conclude on the evidence before it that the University has failed in enforcing the social media guidelines to a degree that justifies finding such an affirmative act.

Third, a Twitter page is a forum designed for expressive activities. *Garnier*, 41 F.4th 1178 ("Social media websites—Facebook and Twitter in particular—are fora inherently compatible with expressive activity."). Defendant stabin testified at the hearing that the Racism Interruptor prompts she posted were intended to serve as tools for individuals to use when they encountered discrimination in their daily lives, rather than to promote discussion on the Twitter page as such. Ultimately, however, the expressive activity on the Twitter page is not "incidental" to its operations, unlike ads on metro buses whose primary function from the government's perspective is to generate revenue. *Seattle Mideast Awareness*, 781 F.3d at 497.

This case falls between *Garnier* and *Seattle Mideast Awareness*, and the Court concludes that @UOEquity is a limited public forum. The University adopted and published guidelines restricting the content that can be posted on the page and permitting administrators to block users who violate them. Those guidelines have been reinforced to faculty and staff who manage the accounts. The degree of enforcement appears less rigorous than in *Seattle Mideast Awareness*, but the nature of the forum is different, and the Court declines to find on the record before it that the University has abdicated responsibility for enforcement. The Court concludes that the University did not affirmatively open @UOEquity as a designated public forum. Therefore, any restrictions on speech in @UOEquity must be reasonable and viewpoint-neutral. *Hopper*, 241 F.3d at 1075. The Court proceeds to evaluate the likelihood of success on Plaintiff's claims for relief against this standard.

      ii.    Application

          a.    Claim One

The Court concludes that Plaintiff raises serious questions on the merits of his claim that Defendant stabin violated his First Amendment rights when she blocked him on Twitter. Defendant stabin testified that she blocked Plaintiff because she thought his post was off-topic and did not make sense in the context of the Racism Interruptor prompt, and she worried that he would disrupt the @UOEquity Twitter page by attracting more off-topic posts from other users. She testified that she was aware of the social media guidelines when she blocked Plaintiff. She testified that she briefly viewed Plaintiff's Twitter page with the retweet of the Racism Interruptor and then blocked him without further investigation and without consulting anyone else. She conceded that she blocked Plaintiff before he attracted disruptive users to the site. Defendant stabin testified that she did not disagree with the sentiment "all men are created

equal" and in fact agreed with it, though she would prefer to use the gender-neutral term "people."

There is some force to Defendant stabin's testimony. She testified that the purpose of the prompt was to give people tools to use to respond to discriminatory comments they might hear in their daily lives. The text announcing the prompt when it was posted reads "You can interrupt racism," which supports her testimony. Am. Compl. ¶ 49. Inserting Plaintiff's response of "all men are created equal" into the blank in the Racism Interruptor prompt yields the following result: "It sounded like you just said 'all men are created equal.' Is that really what you meant?" *See id*. The phase "all men are created equal" could reasonably be said to appear inconsistent with the purpose of the prompt and off topic. A limited public forum may impose subject-matter limitations. *Seattle Mideast Awareness*, 781 F.3d at 497. At least one district court has held that a rule restricting off-topic posts on a public university's social media account was reasonable and viewpoint-neutral. *Krasno v. Mnookin*, No. 21-CV-99-SLC, 2022 WL 16635246, at *15 (W.D. Wis. Nov. 2, 2022). Without the benefit of full briefing on the reasonableness of the off-topic provision, the Court believes at this point that a jury could reasonably conclude that Defendant stabin did not violate Plaintiff's First Amendment rights.

There is also evidence to support the conclusion that Defendant stabin blocked Plaintiff due to his viewpoint. In an email to another University employee, Defendant stabin stated that Plaintiff "was not just being obnoxious, but bringing obnoxious people to the site some." Kolde Second Supp. Decl. Ex. 4. In another internal email, Defendant stabin stated that Plaintiff was "as I recall talking something about the oppression of white men, if I recall." Supp. to Kolde Second Supp. Decl. Defendant stabin also wrote, "Really, they are there to just trip you up and make trouble." *Id.* At the hearing, Defendant stabin testified that she thought Plaintiff was being

obnoxious because he would bring off-topic posts that would move the site away from its purpose. She testified that she wrote the second email quickly and remembered the events wrong. She testified that "they" in the second email referred to people who want to disrupt the Twitter account. The evidence is sufficient to raise serious questions on the merits of Plaintiff's claim that Defendant stabin blocked him on account of his expression of a viewpoint.

          b.     Claim Two

Plaintiff is not likely to succeed in his challenge to the University's alleged custom, policy, or practice of blocking users on @UOEquity based on unfettered professional judgment. After an initial, erroneous response to Plaintiff's public records request, the University clarified that the managers of its social media accounts do not rely solely on their own professional judgment but rather on the University's social media guidelines, which have existed at least since 2019. Widdop Decl. ¶ 4, Ex. 2; Carp. Decl. Ex. 6; Larson Decl. I; Larson Decl. II; Larson Decl. III. The University provided a copy of those guidelines, both a short, public-facing version, and a longer internal document. Larson Decl. I Ex. 1; Larson Decl. II Ex. 1.

The Court first observes that some degree of professional judgment must be exercised when applying social media guidelines. *Cf. Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (stating that "some degree of discretion . . . is necessary" in the context of officials screening voters for political badges at the entrance to the polls). Given the wide range of possible postings, it would be impossible to create guidelines specific enough to entirely remove professional judgment from the decisionmaking process. The same is true of the more formal policy that Plaintiff suggests is required. Any such document will require interpretation and application by the University employees managing the accounts.

The evidence before the Court is not enough to suggest that there is or was a pattern or practice of blocking users based on unfettered discretion rather than the guidelines. Data for the @UOEquity Twitter account shows that only three users have been blocked: Plaintiff, and two other users, one with the handle @anonymousbruter and one with the handle @GregHBlog. Kolde Second Supp. Decl. Ex. 4. At the hearing, Plaintiff provided evidence that each of these blocked users had made a conservative post on Twitter, but Defendant stabin testified that she could not remember why she had blocked those two users. Neither party provided information on the date the other users were blocked, so the Court has no basis to infer a relationship between any particular post by those users and the decision to block those users. In sum, Plaintiff has not shown that he is likely to establish that the University had a custom, pattern, or practice of permitting blocking of users on Twitter through the exercise of unfettered discretion.

c.    Claim Three

Plaintiff's third claim for relief is a facial challenge to the University's social media guidelines. Plaintiff argues that even if some or all of the social media guidelines have not been applied to him, he has standing to challenge them because he has been self-censoring out of a fear of being blocked or permanently banned pursuant to the guidelines. Gilley Supp. Decl. ¶ 19, ECF 33; Pl. Reply 7-9, ECF 37; Pl. Resp. to Mot. to Dismiss 6-8.

The Ninth Circuit has recognized that in some cases, pre-enforcement challenges to a law or rule are appropriate in order to avoid unduly chilling speech. *Wolfson v. Brammer*, 616 F.3d 1045, 1059-60 (9th Cir. 2010); *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010); *Canatella v. California*, 304 F.3d 843, 855 (9th Cir. 2002). "[T]he Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Lopez*, 630 F.3d at 785 (internal

quotation omitted). However, "[m]ere [a]llegations of a subjective 'chill' are not an adequate

substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at

787 (internal quotation omitted).

A plaintiff must meet three requirements to establish standing to bring a pre-enforcement

challenge. First, they must "show a reasonable likelihood that the government will enforce the

challenged law against them." *Lopez*, 630 F.3d at 786. Second, they must "establish, with some

degree of concrete detail, that they intend to violate the challenged law." *Id.* Third, the court

considers whether the challenged law is applicable to the plaintiff. *Id.*

Assuming for the sake of argument that Plaintiff has established that he intends to violate

the guidelines, and that the guidelines apply to him, the Court concludes that Plaintiff has failed

to meet the first requirement.[4] Plaintiff's showing on the likelihood of enforcement falls short

both because the state action he faces does not expose him to enforcement consequences and

because he has not demonstrated that it is likely to occur.

The quintessential basis for a pre-enforcement challenge is a threatened prosecution. *Id.*

at 786. However, civil enforcement actions may also qualify. In *Wolfson*, for instance, a

candidate for judicial office in Arizona challenged certain canons of the state's Code of Judicial

Conduct that restricted speech and campaign activities while he was a candidate. 616 F.3d at

1051-52. He faced potential discipline if he violated the canons. *Id.* at 1056-57. Similarly, in

*Canatella*, an attorney faced an actual threat of discipline where the state bar association had

brought disciplinary proceedings against him in the past and did not disavow the possibility of

---

[4] The Court notes that Plaintiff provided minimal detail about his plans to interact with
@UOEquity on Twitter in the future. He testified only that he intended to do so, without
explaining the types of posts he intended to make.

relying on challenged provisions of the state bar statutes and rules of professional conduct to bring disciplinary proceedings against him in the future. 304 F.3d at 852-53.

More unusual exertions of government authority may also give a plaintiff standing for a pre-enforcement challenge. *E.g.*, *Meese v. Keene*, 481 U.S. 465 (1987). In *Keene*, a state senator from California wished to show three Canadian films that fell under the statutory category of "political propaganda" as defined by the Foreign Agents Registration Act of 1938. *Id.* at 467. The statute required covered expressive materials to comply with registration, filing, and disclosure requirements. *Id.* The Supreme Court concluded that based on detailed affidavits he submitted in support of his claim, the state senator "ha[d] alleged and demonstrated more than a 'subjective chill'" because showing films that were designated as political propaganda would harm "his personal, political, and professional reputation," including his chances for re-election. *Id.* at 473. This was enough to establish standing. *Id.* at 475-77.

Here, the feared state action does not support a pre-enforcement challenge. Plaintiff states that he fears he will be blocked or banned from interacting with @UOEquity on Twitter. Gilley Supp. Decl. ¶ 19. At the hearing, Plaintiff stated without elaboration that he was self-censoring from interacting with any of the University of Oregon's Twitter accounts. The Court doubts that Plaintiff is self-censoring out of a genuine fear of consequences. His testimony provides no basis for the Court to conclude that he fears any collateral consequences if he were to engage in speech on these platforms. His submissions to the Court acknowledge that he faces no such consequences.[5] Plaintiff faces no risk of prosecution, professional discipline, or harm to his

---

[5] *See* Pl. Reply 9. The cases on which Plaintiff relies do not bolster his position. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1733 (2017) addressed a state statute that made it a felony for registered sex offenders to access a social media site if children could become members of the site. *Healy v. James*, 408 U.S. 169, 170-71 (1972) addressed a state college's denial of official recognition to a political student group. This decision deprived the group's members of use of

reputation or employment. As Defendants observe, by self-censoring, Plaintiff is doing nothing more than imposing on himself the consequence he says he fears—a lack of opportunity to interact with the @UOEquity Twitter account. Def. Resp. 11. Plaintiff does not face a choice between holding his tongue on the one hand and speaking and suffering the consequences on the other, so the state action alleged is insufficient to support a pre-enforcement challenge.

Plaintiff has also failed to show that enforcement (i.e., blocking) is reasonably likely to occur. He was blocked once in the past, and the University has since unblocked him and stated that it does not intend to block him based on his exercise of protected speech in the future. Park Decl. ¶¶ 4-5, Ex. 2 at 1. As discussed above, Plaintiff has failed to establish a pattern of viewpoint-based blocking by the University. Indeed, only three users have ever been blocked on @UOEquity, and the employee who blocked Plaintiff acted alone and has since retired. Once they learned of Plaintiff's lawsuit, the University's attorneys acted swiftly to see that Plaintiff was unblocked. Under these circumstances, Plaintiff has not shown a reasonable likelihood that he will be blocked again. Instead, he has alleged a subjective chill. He lacks standing to bring a pre-enforcement challenge to the social media guidelines as a whole.

d. Claim Four

Plaintiff raises serious questions on the merits of his claim that the application of specific portions of the social media guidelines to him violated the First Amendment. This follows from the conclusion that Plaintiff raises serious questions on the merits of his claim that he was blocked based on his viewpoint. Defendant stabin testified that she applied the "off topic" provision of the guidelines in blocking Plaintiff. The social media guidelines themselves do not

---

the school newspaper and campus bulletin boards. *Id.* at 181. The harm was ongoing, so the Supreme Court did not need to discuss a pre-enforcement challenge.

permit viewpoint discrimination. Larson Decl. II Ex. 1 at 8 ("Don't delete comments or block users because they are critical or because you disagree with the sentiment or viewpoint."). Even if Plaintiff's post were off-topic (and reasonable minds could conclude that it was not), Defendants still could not block him for expressing a particular viewpoint because to do so would be inconsistent with both the guidelines and the Constitution.

Because Plaintiff has shown serious questions going to the merits on Claims One and Four, the Court proceeds to the next *Winter* factor.

B.    Irreparable Harm

Assuming for the sake of argument that he prevails on one of his backward-looking claims, Plaintiff can demonstrate past harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiff was blocked from interacting with @UOEquity for a period of time and thereby suffered past harm. Am. Compl. ¶¶ 62-63; Park Decl. ¶¶ 4-5, Ex. 2 at 1 (stating that Plaintiff had been unblocked).

However, Plaintiff fails to establish that he is likely to suffer irreparable harm in the future. To demonstrate irreparable harm, a plaintiff must show that "First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought." *Elrod*, 427 U.S. at 373. Irreparable harm must be "*likely,* not just possible." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) (internal quotation omitted). This standard "cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (holding that the fact that the plaintiff had been subjected to a chokehold in the past was not on its own enough to show likelihood that he would be subjected to a chokehold in the future). Isolated incidents of the challenged behavior

are insufficient to support an injunction. *See id.* at 115-16 (Marshall, J., dissenting) (providing statistics about the use of chokeholds on dozens of individuals other than the plaintiff in recent years); *Midgett v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 848, 850 (9th Cir. 2001) (holding that the plaintiff did not show irreparable harm where he allegedly experienced four prior incidents of violations of the Americans with Disabilities Act by the defendant agency).

Plaintiff has not established that the University of Oregon is likely to block him on Twitter in the future for the exercise of protected speech. After Plaintiff filed suit, the University promptly unblocked him, and the University's general counsel sent a letter stating that the University did not intend to block Plaintiff in the future due to the exercise of protected speech. Park Decl. ¶¶ 4-5, Ex. 2 at 1. Internal emails show that the University's general counsel requested that Plaintiff be unblocked immediately unless he engaged in speech "not protected by the United States and Oregon Constitutions." Carp Decl. Ex. 5 at 2. The University's Communications Department also sent an email to staff reinforcing that viewpoint discrimination is not permitted when managing social media accounts. Larson Decl. III Ex. 4. Dr. Alex-Assensoh, the head of the Division of Equity and Inclusion, stated that the University "should not block users on social media based on their viewpoints."[6] Carp Decl. Ex. 3, Alex-Assensoh Dep. 98:19-20. These actions point to a low likelihood that Plaintiff will be blocked again.

Furthermore, the circumstances indicate that Defendant stabin's blocking of Plaintiff was an anomaly. Blocking is rare on the @UOEquity Twitter account. Since 2017, there have been a combined 2,558 replies and retweets by other users on the @UOEquity Twitter account. Larson

---

[6] Defendant stabin testified that while she was managed by the University's Communications Department, she understood that her successor would be managed by the Division.

Decl. III ¶ 4. Only three users have been blocked since the account was created, and currently no users are blocked. *Id.* ¶ 5. Defendant stabin testified that she acted alone in blocking Plaintiff and did not consult any other University staff after she blocked him. There is no evidence indicating otherwise. Defendant stabin has since retired from the University, and her successor was still unknown on the date of the hearing on the present motion. In this context, it would be speculative to conclude that this unknown successor is likely to block Plaintiff on Twitter again. Plaintiff has not met his burden to show that he is likely to be blocked in the future.

Plaintiff argues that the mere existence of a colorable First Amendment claim is enough to establish irreparable injury. Pl. Mot. 15. The Ninth Circuit has stated that "in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Harris*, 772 F.3d at 570. However, the Ninth Circuit also affirmed that consideration of irreparable harm cannot "collapse" into the analysis of likelihood of success on the merits. *Id.* at 582-83.

In this case, the Court has concluded that Plaintiff may well succeed on the merits with respect to his backward-looking claims for relief, while he is not likely to succeed on the merits with respect to his forward-looking claims. Significantly, Plaintiff lacks standing to challenge the guidelines as a whole on behalf of others. *Supra* at 31. To presume irreparable harm in the future under these circumstances would run counter to the Supreme Court's admonishment that the mere possibility of irreparable harm does not warrant the granting of a preliminary injunction.

*Winter*, 555 U.S. at 22.[7] Plaintiff has not met his burden to establish that he needs interim injunctive relief while his claims are pending.

The Court concludes that Plaintiff has not shown more than a possibility that he will be blocked from interacting with @UOEquity in the future. While he may well succeed in proving that the University violated his First Amendment rights in blocking him in the past, Plaintiff has not shown that the University is likely to do so again. Plaintiff cannot establish that he is likely to suffer irreparable harm in the future.

C.    Balance of Equities and Public Interest

The balance of equities and the public interest favor Defendants. These factors merge where the party opposing the injunction is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants are not likely to block Plaintiff on Twitter in the future based on his exercise of protected speech, and Plaintiff lacks standing to bring a broader challenge to the social media guidelines on behalf of other individuals. The University of Oregon would be unnecessarily burdened by the issuance of an injunction.

//

//

//

//

//

//

---

[7] This case is distinguishable from *Garnier*. In *Garnier*, the defendants repeatedly deleted the plaintiffs' comments before blocking the plaintiffs on Facebook, and they only unblocked the plaintiffs a few days before trial. 41 F.4th at 1165-67. This course of conduct shows a sustained commitment to restricting speech that is not present in the matter before this Court. Furthermore, the defendants in *Garnier* did not establish rules governing the Facebook page. *Id.* at 1165.

**CONCLUSION**

Defendants' Motion to Dismiss for Lack of Jurisdiction [23] and [35] is DENIED.

Plaintiff's Motion for Preliminary Injunction [2] is DENIED.

IT IS SO ORDERED.


DATED:___January 26, 2023_____.


_____
MARCO A. HERNANDEZ
United States District Judge